CARROLL, Judge.
Appeal No. 69-6 is by the plaintiff below, Pinellas Central Bank & Trust Company, herein referred to as the bank, from a judgment denying it recovery on a promissory note given to the bank by the appel-lee International Aerodyne, Inc., herein referred to as Aerodyne, dated September 1, 1965, in the amount of $95,040 as consideration for sale by the bank to Aerodyne on that date of a DC-7 aircraft, and holding Aerodyne had effectively rescinded that sale. Appeal No. 69-470 is by the defendant Aerodyne assigning as error the grant *874 ing of a partial summary judgment which was rendered against it on all but the first of six counts contained in its counterclaim as amended.
The background of the cause to which these two appeals relate, as disclosed in the record, was extensive and involved transactions spanning seven months. On May 4, 1965, Aerodyne entered into an agreement with Pasco Aviation, Inc., herein referred to as Pasco, for the sale to the latter of a Douglas DC-7 aircraft for a consideration of $115,000. The arrangement called for payment by Pasco to Aerodyne of the sum of $92,500 plus transfer of an Aerocom-mander aircraft, free of liens, which was considered to have a value of $22,500. On the date of that agreement, Pasco gave Aerodyne a bill of sale to the Aerocom-mander, which was recorded by Aerodyne on May 7, 1965, in the office of the federal agency designated for that purpose.
On the closing, which took place on May 11, 1965, the bank advanced to Aerodyne $85,000 of the purchase price for the DC-7 for the account of Pasco, for which the bank on that date received from Pasco a promissory note in the sum of $106,250, payable in sixty monthly installments of approximately $1,771 each. The amount of that note covered the $85,000 which had been advanced by the bank to Aerodyne for Pasco, plus interest thereon at 5% per annum for five years. At the same time Aerodyne made a conditional bill of sale of the DC-7 to Pasco. That instrument, as filled in by the bank, recited the sale price as $150,000. It acknowledged receipt by Aerodyne of $65,000 (thus reflecting an unpaid balance of $85,000). However, it referred to and was conditioned on payment of the note for $106,250, given to the bank by Pasco. Simultaneously, Aerodyne executed an assignment of the conditional sale contract to the bank, to serve as a first lien on the DC-7 as security to the bank for the repayment of the amount it had advanced, plus interest. On the same date, Pasco gave Aerodyne a note and mortgage on the DC-7, in the amount of $65,-000, which created a lien on the DC-7 in favor of Aerodyne, inferior to the lien of the bank as assignee of the sale contract. It was explained that the note and mortgage given by Pasco to Aerodyne was “interim security” for the latter pending the bank’s intended refinancement of the sale within 30 days, which refinancing never came about.
Several days after the closing, as a result of inquiries by Aerodyne, it was learned that the Aerocommander was subject to two encumbrances, one for $31,000 in favor of a third party, and one in the form of a chattel mortgage from Pasco to the bank in the amount of $46,421.50. Thereupon, Aerodyne informed Pasco that it would reject the Aerocommander as part, of the purchase price unless cleared of liens within 30 days; otherwise the price was $115,000. The liens were not removed from the Aerocommander. No return bill of sale thereon appears to have been made by Aerodyne to Pasco, and later, in August of 1965, the bank repossessed the Aerocom-mander for default in the chattel mortgage which it held thereon.
Upon rejection by Aerodyne of the Aero-commander as part of the purchase price of the DC-7, a balance of $30,000 was owing to Aerodyne from Pasco, representing the difference between the purchase price of $115,000 and the $85,000 received by Aerodyne from the bank, plus $10,000 which Aerodyne had loaned Pasco on or about the date of closing, making a total of $40,000 payable to Aerodyne by Pasco. Aerodyne held and retained the $65,000 note which it had received from Pasco at the time of closing, with the (second) mortgage on the DC-7 given to secure said note.
On May 28, 1965, Aerodyne, through its attorneys, wrote the bank objecting to the amounts which the bank had inserted in the conditional sale contract, complaining that Aerodyne’s second mortgage security was prejudiced thereby. On June 7, 1965, the bank, through its attorneys, replied by let *875 ter that the conditional sale contract, as drawn, accomplished what Aerodyne had desired by furnishing security to the bank for repayment of the portion of the purchase price of the DC-7 which the bank had advanced, and in that letter the bank agreed it would not sell or assign the conditional sale contract unless the balance due from Pasco to Aerodyne was paid, and agreed that if it should repossess the DC-7 from Pasco it would permit Aerodyne to repurchase the aircraft for the balance of the principal and interest due the bank at the time of repossession, plus the repossession expense.
By August of 1965, Pasco had become in default in its payments on the aforesaid notes to the bank and to Aerodyne. At that time the DC-7 was known to be based in Luxembourg in the custody of Interocean Airways, the bailee of Pasco. Interocean had been operating the DC-7 on charter in Europe. Aerodyne had a representative in Copenhagen, Denmark, a vice-president of the company named Holbert.
During the early part of August 1965, a series of conferences were held by representatives of Aerodyne and of the bank, by telephone and in a meeting, as to ways and means for collecting the amounts owed them by Pasco. According to testimony of the president of Aerodyne, those conferences included discussion of the possibility of Aerodyne repurchasing the DC-7 from the bank for the amount due the bank for its advance thereon; that Aero-dyne instructed its European representative Holbert “to check into the condition of the aircraft; where it was and what could be done with it;” that Holbert reported There was a possibility we could put it to work in Europe.” Following those preliminary discussions the bank obtained a bill of sale of the DC-7 from Pasco, on August 13, 1965. Thereupon Aerodyne, through its president and Holbert, made contact with a prospective purchaser of the aircraft and with a prospective lessee thereof, of Copenhagen, but no sale or lease of the DC-7 to such parties was effected.
On September 1, 1965, a further meeting was held between representatives of Aero-dyne and the bank, as a result of which Aerodyne repurchased the DC-7 from the bank. A bill of sale to the aircraft, bearing that date, was made and delivered by the bank to Aerodyne, and on the same date, in payment for the DC-7, Aerodyne gave the bank its promissory note, payable in 36 monthly installments of $2,640 each, and a chattel mortgage on the DC-7 as security therefor, in the sum of $95,040, representing the amount due the bank for repayment of its initial advance of $85,000 plus interest thereon for the period of the note. The arrangement for that resale by the bank to Aerodyne on September 1, 1965,. called for delivery of the aircraft to Aero-dyne in Luxembourg free and clear of encumbrances other than the lien thereon represented by the May 11 conditional sale contract. That was provided for by a letter from Aerodyne to the bank, dated September 1, 1965, and bearing the signed acceptance by the bank, in which it was stated that Aerodyne could be released from that repurchase in event there were other liens or encumbrances on the aircraft, not incurred by the parties, which neither Aero-dyne nor the bank should be willing to pay.[1]
*876 On the same date, September 1, 1965, and as a part of the transaction, the bank agreed to make a loan to Aerodyne on another of its aircraft in the amount of $175,-000, and subsequently made that loan.
As a means of effecting delivery of the aircraft to Aerodyne in Luxembourg, the bank, on September 3, 1965, wrote to Inter-ocean Airways, the bailee custodian of the aircraft, as follows:
“This is your authority to release Douglas DC7 aircraft, N6314C, Serial No. 44278, together with all its equipment and records to Mr. Robinson S. Holbert.”
Likewise, on September 3, 1965, the bank wrote to Aeroydne’s vice president Holbert, in Copenhagen, authorizing him to take possession of the DC-7, as follows:
“You are hereby authorized and instructed to pick up Douglas DC7 aircraft, N6314C, Serial No. 44278, together with its records and equipment, ferry the aircraft to Amsterdam or Copenhagen, at your discretion, for the purpose of maintenance, including the repair or replacement of an engine on the aircraft.”
On September 3 or 9, 1965 (the evidence is in conflict as to which date), Aerodyne made two payments on its note to the bank. Those aggregated $5,280, and represented the monthly payments whi.ch were provided to be paid on September 15 and on October 15, 1965.
Notwithstanding that Aerodyne’s president, early in August, told Holbert to investigate the condition of the DC-7 in Luxembourg, according to Holbert’s testimony he did not see or inspect the DC-7 until September 18, 1965, which was more than two weeks after Aerodyne had repurchased the aircraft from the bank. Hol-bert testified he went to the airport in Luxembourg where the plane was located at 5:30 P.M. on Saturday, September 18; that no one was working there at that time; that he made a partial inspection and returned the next morning (Sunday) and made a more complete inspection; that he found one of the engines was “feathered,” certain of the instruments (not described) were missing as was some of the radio equipment, and that the passenger seats had been removed and replaced by those of a DC-6 which were inferior and not in good condition. Holbert stated he learned that Interocean had a claim against the aircraft for maintenance and parking charges, but there was no one there at the time who could inform him as to the amount thereof. Holbert testified that on Sunday, September 19, he telephoned the managing director of Interocean, Mr. Peck, at his home in Luxembourg, and that Peck could not inform him offhand as to the amount of the maintenance charges against the aircraft. [Later it was determined that Interocean’s claim for maintenance and parking charges was $785, and ultimately a bill therefor from Interocean, made out to the bank and dated December 2, 1965, was paid.] In that telephone conversation Holbert learned from Peck that the records of the aircraft were in Interocean’s possession, but that there would be a delay before they could be delivered, until return from vacation of a member of the company in whose personal charge they had been placed. Otherwise, the records were available for delivery when Interocean’s bill for maintenance and storage should be paid.
Peck, of Interocean, testified that the passenger seats in the first class section of the DC-7 were not removed; that the other passenger seats had been taken out *877 and placed in another aircraft as a temporary arrangement, with intent to return them to the DC-7; that they had been exchanged for seats from a DC-6, which were placed in the DC-7; that the seat exchange was made in September or shortly before, and that the DC-7 seats could have and would have been returned to the aircraft by him- upon request, but that no such request was made; that the DC-7 seats were available for return to the aircraft throughout the remainder of 1965; but that he did not know their whereabouts in 1968, when he testified.
After Holbert’s inspection of the DC-7 on September 18 and 19, 1965, no action was taken by Aerodyne with respect to the aircraft until October 4, 1965, on which date Holbert sent a letter to Interocean requesting it to ship the plane’s records to Miami, and to send to Aerodyne a bill for the charges for maintenance, made out to the bank; and requesting Interocean to continue to care for the aircraft.[2]
A month later, on November 2, 1965, Aerodyne sent a letter to the bank reciting that there had not been a delivery of possession of the aircraft free of encumbrances ; that the plane’s records had not been made available; and that certain of the equipment was missing; and stating that if the bank did not remedy such matters by November 12, Aerodyne would rescind the agreement and require return of the partial payment of $5,280 which it had made thereunder.
On November 8, 1965, the bank, through its attorneys, replied by letter to Aerodyne in which the September 1, 1965 sale transaction was reviewed, and in which the bank took issue with Aerodyne’s contention that the aircraft was not delivered, asserted that the aircraft had been sold as is and pointed out that Aerodyne had had opportunity to inspect the plane. As to Inter-ocean’s claim for maintenance and parking, the bank announced a willingness to pay, and offered to pay those and any other such claims against the aircraft for maintenance or other charges or fees which had accrued prior to September 3, 1965, and requested that Aerodyne submit the bill therefor which the bank then would pay to the creditor or to Aerodyne; and the bank reasserted its claim of right to be paid in accordance with the note and chattel mortgage given to it by Aerodyne on September 1, 1965.
On November 10, 1965, Aerodyne responded with a letter to the bank, reasserting and enlarging on the position taken in its earlier letter of November 2, and adding that even if Aerodyne should rescind the September 1, 1965 sale it remained interested in the aircraft and would repurchase it from the bank, if the bank paid the charges against the aircraft and could deliver it with its records and with the missing instruments and equipment, including the seats, restored.
On November 16, 1965, the bank directed its representative in Amsterdam to locate and obtain the records relating to the DC-7. Pursuant thereto the bank’s agent, on December 2, 1965, went to Luxembourg, paid Interocean’s charges for maintenance *878 and storage, received the records of the aircraft and forwarded them to the bank.
On December 2, 1965, Aerodyne wrote the bank announcing it was rescinding the September 1, 1965 agreement for sale of the DC-7, because of failure of the bank to deliver the aircraft “complete with records.” With that letter Aerodyne tendered a bill of sale to the DC-7, and demanded surrender of its $95,040 note of September 1, 1965, and repayment of the $5,280 paid thereon. Again, in that letter, Aerodyne announced willingness to purchase the aircraft from the bank if it could be delivered with its equipment complete.
This litigation was commenced by the filing of an action by the bank against Aerodyne, in the circuit court of Dade County, on August 2, 1966. In the initial complaint the bank alleged sale by it to Aerodyne of the DC-7 on September 1, 1965, attaching a copy of the bill of sale; that as consideration therefor Aerodyne had agreed to pay the bank $85,000, with interest at 4% per annum, in 36 monthly installments commencing September 15, 1965; that Aerodyne had paid the first two installments aggregating $5,280; that the monthly payments subsequently falling due were not paid; and that the bank had elected to declare the entire balance of the indebtedness to be due and payable, for which recovery was sought. Thereafter the bank filed an amended complaint, in which no reference was made to the sale of the DC-7, and in which the bank declared on the promissory note for $95,040 dated September 1, 1965 (which it had received from Aerodyne on sale of the DC-7), acknowledging payment of $5,280 thereon, and alleging default and acceleration. A copy of the note was attached to the amended complaint.
Aerodyne answered, denying it was indebted to the bank, and averring that the note sued upon was given as a part of the sale transaction; that the bank had failed to deliver the aircraft “as required,” and had failed to obtain a release of a lien held thereon by Interocean; that Interocean had “refused” to deliver the records of the aircraft; that certain parts of the aircraft were in possession of Interocean or of persons unknown; that said “defaults” were not cured by the bank; that there was a failure of consideration; and that Aero-dyne had rescinded the sale and thereby was released from any obligation on the note sued upon. Aerodyne also filed a counterclaim, which as amended contained six counts. The first count was a repetition of the matters set forth in the answer. On the remaining five counts thereof summary judgment was entered against Aero-dyne, the merits of which ruling are considered and determined later in this opinion.
Following trial of the cause before the court a final judgment was entered in which it was held that the plaintiff bank had breached the contract of sale and therefore was not entitled to recover on its promissory note. Therein it was further held that the aircraft had not been delivered “as required by said contract;” that it was not “free and clear of liens and encumbrances as required by said contract;” that the records of the aircraft were not delivered; that the absence of “passenger seats, instruments and radios rendered said aircraft substantially deficient and at variance with the configuration contemplated in said contract;” that the sale had not been made “as is, where is;” that the bank had made no effectual tender of performance ; that there was a failure of consideration ; and that Aerodyne had “legally and effectually rescinded the aforesaid contract of September 1, 1965.” In accordance with those holdings the court entered judgment in favor of Aerodyne against the bank for the amount it had paid on the note, $5,280 with interest thereon, directed the bank to return the promissory note to Aerodyne and declared the bank to be the owner of the DC-7.
Upon consideration of the facts of the case as disclosed in the record, and the law applicable thereto, we hold that the trial *879 court was in error in concluding that Aerodyne had effectively rescinded the sale transaction, and in denying recovery to the bank on the promissory note sued upon.
We regard as correct the contention of the appellant bank that with the sale of the DC-7 having been made by the parties in Florida, when the aircraft was in custody of a bailee in Luxembourg, the required delivery by the seller was sufficiently accomplished by notice from the seller to its bailee to surrender possession to the purchaser. Mitchell v. McLean, (1857) 7 Fla. 329; Gibson v. Stevens, 8 How. 384, 49 U.S. 384, 12 L.Ed. 1123; Clark v. Shannon & Mott Co., 117 Iowa 645, 91 N.W. 923. While we agree with the ruling of the trial court that the parties did not specify that the sale was “as is,” neither did their agreement provide expressly with reference to the condition of the aircraft. Nevertheless, the parties must be presumed to have understood that the aircraft would reflect the wear and tear and depreciation which reasonably could be expected to have occurred thereto as a result of the use to which it had been put since the prior sale thereof in May of 1965. But notwithstanding the apparent failure of Aerodyne to avail itself of the opportunity to determine the condition of the aircraft (including its equipment), prior to purchasing it from the bank on September 1, 1965, it is reasonable to assume that in making the sale the parties proceeded on the basis that, when delivered, the aircraft would contain its customary and necessary equipment. Therefore, to the extent that some items of equipment were missing from the aircraft at the time of the delivery thereof, there was a partial failure of consideration.
But a purchaser of personal property may not rescind the sale for reasons or circumstances relating thereto for which rescission should not be granted by a court of equity, such as for a partial failure of consideration which is compensable by damages and which is not so substantial and fundamental as to tend to defeat the object of the parties in making the contract.
Under the law relating to rescission of contracts for purchase and sale, as pronounced in the Florida decisions, a breach of contract is not regarded as a basis for rescission in the absence of fraud or some other independent ground for equitable relief therefrom. Thus in International Realty Associates v. McAdoo, 87 Fla. 1, 99 So. 117, 119, the Supreme Court said:
“The rule is well settled in this country that cancellation or rescission will not be granted solely for breach of contract, in the absence of fraud, mistake, undue influence, multiplicity of suits, cloud on title, trust, or some other independent ground for equitable interference.”
Later, in Savage v. Horne, 159 Fla. 301, 31 So.2d 477, 481-482, the Supreme Court, referring to International Realty Associates v. McAdoo, supra, said:
“ * * * The power of the court to decree a cancellation or rescission of a seller’s and purchaser’s contract was reaffirmed but limited this power not solely for the breach of a contract in the absence of fraud, mistake, undue influence, multiplicity of suits, clouds on title, trust or some other independent ground for equitable interference. If a breach of the contract is established on the part of the sellers, coupled further with the sellers’ inequitable conduct which may be equivalent to fraud, mistake, undue influence, multiplicity of suits, cloud on title or some other independent ground of equity, then the bill praying for cancellation or rescission and an accounting incidental thereto may be sustained. Willis v. Fowler, 102 Fla. 35, 136 So. 358; Smith v. Home Seekers’ Realty Co., 97 Fla. 236, 122 So. 708, 67 A.L.R. 807; Hinzelin v. Bailly, 155 Fla. 837, 22 So.2d 43.”
A good statement of the law as to grounds or circumstances for which courts *880 will or will not grant rescission of contracts was made by the New York Court of Appeals in Callanan v. Powers, 199 N.Y. 268, 92 N.E. 747, 752, as follows:
“ * * * There is no hard and fast rule on the subject of rescission, for the right usually depends on the circumstances of the particular case. It is permitted for failure of consideration, fraud in making the contract, for inability to perform it after it is made, for repudiation of the contract or an essential part thereof, and for such a breach as substantially defeats its purpose. It is not permitted for a slight, casual, or technical breach, but, as a general rule, only for such as are material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract. Failure to perform in every respect is not essential, but a failure which leaves the subject of the contract substantially different from what was contracted for is sufficient. If the party who seeks rescission has an adequate remedy at law, ordinarily he is not entitled to rescind, but in case of repudiation, or of a breach going to the root of the contract, unless the damages can be ascertained with reasonable certainty, rescission is a matter of right, with restitution instead of compensation. * * * ”
See, also, Schaff v. Kennelly, N.D.1953, 61 N.W.2d 538.
In Richard Bertram & Co. v. Barrett, Fla.App.1963, 155 So.2d 409, 411, the court said:
“ * * * It is not every breach of contract which authorizes a rescission, the injured party being generally required to seek damages as a remedy. The grounds on which equity interferes for cancellation or rescission are distinctly marked, and every case proper for this branch of its jurisdiction is reducible to a particular head. These grounds are primarily, fraud, mistake, turpitude of consideration, and circumstances entitled him to relief on the principle of quia timet. The rule is well settled in this country that cancellation or rescission will not be granted for breach of contract, in the absence of fraud, mistake, undue influence, multiplicity of suits, cloud on title, trust, or some other independent ground for equitable interference.”
In McDonald v. Connell, Fla.App.1963, 158 So.2d 780, the second district court of appeal affirmed a judgment denying rescission of the sale contract which was sought for partial failure of consideration, and therein said (158 So.2d at 785):
“Generally speaking, jurisdiction in equity is rarely entertained in cases involving contracts for the sale of personal property, because in the ordinary case there is an adequate remedy at law for damages.”
That pronouncement by the district court of appeal is in conformity to general statements of the law on the subject. In 17A C.J.S. Contracts § 420, it is said: “There must be a substantial failure of consideration to warrant rescission. An unsubstantial failure of consideration is not ground for rescission but only the basis for recovery of damages, and so a contract may not be rescinded for a partial failure of consideration not affecting the entire contract.” The treatment of the subject in 17 Am.Jur.2d, Contracts, § 398, is substantially to the same effect. In Black, Rescission and Cancellation, Second Edition, Vol. I, § 160, p. 466, it is said: “And equity will not cancel a sale on the ground of partial failure of consideration, where the party complaining had an opportunity to examine, test, or apprise the consideration before completing the contract, and the other party was guilty of no fraud.”
In this case neither the lien of the bailee, the temporary unavailability of the records of the aircraft nor the condition of disrepair of one of the engines were matters which could furnish a basis *881 for rescission of the sale by the purchaser. The bailee’s charge for maintenance and storage ($785), which represented the only outstanding lien, was no ground to rescind because the parties had agreed (Footnote No. 1) that the existence of an outstanding lien or encumbrance would be a basis for the purchaser to renounce the sale only if neither of the parties was willing to discharge it by payment, and when advised of such charge of Interocean the bank readily recognized its obligation to pay it, announced willingness to do so, and subsequently paid the item. After receiving the bank’s prompt offer to pay or to reimburse Aerodyne for paying Interocean’s charges, Aerodyne could have obtained the records without undue delay by advancing the amount necessary to pay Interocean’s bill. Moreover, there was no showing that Aerodyne had any immediate need for the records, so as to be unduly inconvenienced by a delay of a week or so in obtaining them. In fact, Aerodyne did not inquire of Interocean regarding the records until more than two weeks after the sale, and still later Aerodyne requested Interocean to hold and care for the aircraft for it until further notice. An agent of the bank had no difficulty in obtaining the records, which he did by appearing at the office of Interocean and paying its storage charges on December 2, 1965, which, incidentally, was the date on which Aerodyne dispatched the letter to the bank announcing it was rescinding the sale. The fact that one of the engines needed repair was not material, as the purchaser had knowledge thereof when the sale was made.
Other than the foregoing, which amounted at most to some inconvenience to the purchaser and a not unreasonable period of delay in obtaining the records which Aerodyne would have experienced had it chosen to obtain them (with no showing that such temporary delay would have been prejudicial), the only matter upon which Aerodyne could rely as a basis for seeking to rescind the sale was a partial failure of consideration represented by absence from the DC-7 of certain replaceable instruments and items of communication equipment, and the (available) missing seats.[3]
Aerodyne was not entitled to rescind the sale for that partial failure of consideration. There was no fraud or misrepresentation by the seller, and no other independent equitable ground for which a court would have interfered. The injury occasioned to the purchaser by the absence from the aircraft when delivered of the instruments and equipment described in Footnote No. 3 was compensable in money damages, and the absence from the aircraft of such replaceable items of equipment did not amount to a fundamental breach of the contract going to the root of the transaction, nor was it such as to tend to defeat the object of the sale contract.
Accordingly, in appeal No. 69-6, the judgment is reversed, and the cause is remanded to the circuit court for further proceedings not inconsistent herewith, including determination of the damages to be allowed in favor of Aerodyne against the bank for the partial failure of consideration consisting of the instruments and other equipment which were missing from the aircraft at the time of the sale and (symbolic) delivery thereof in September of 1965, and including entry of judgment in *882 favor of the bank against Aerodyne for the amount due the bank on the promissory note sued upon, giving Aerodyne tíredit or set-off for its damages as so determined and for the two monthly payments previously made by Aerodyne on the note.
On the appeal by Aerodyne, No. 69-470, challenging the partial summary judgment rendered against it on counts II through VI of its counterclaim as amended, we have considered the contentions presented by the appellant Aerodyne in the light of the record and briefs and find therein no basis to disturb that ruling. In the partial summary judgment which was entered, the trial judge outlined the matters presented by the several counts of the counterclaim which were involved, and gave sound reasons for his decision thereon. A restatement thereof by this court would be without useful purpose, and would unduly extend this already lengthy opinion.
On appeal No. 69-6: reversed and remanded with directions.
On appeal No. 69-470: affirmed.

. That letter of September 1, 1965, from Aerodyne to the bank, read as follows:
“In reference to our [Aerodyne’s] purchase of even date of Douglas DC-7 aircraft N-6314C, Manufacturer’s Serial Number 44278, you agree as follows:
“1. — The physical possession of the aircraft is to be delivered to us in Luxemburg free and clear of any liens or encumbrances, other than the Conditional Sales Contract dated May 11, 1965 between Pinellas Central Bank and Trust Company and Pasco Aviation, Inc.
“2. — In the event there are any alleged liens or encumbrances not incurred by ourselves and either you or ourselves do not wish to pay them, then we are to be released of our purchase commitment on the aircraft, and any funds previously paid will be refunded to us.
“3. — You agree that we are to have peaceful possession of the aircraft.
*876 “4. — In the future we will make payment in the amount of Two Thousand Six Hundred and Forty ($2,640.00) Dollars per month including interest, in lieu of the One Thousand Seven Hundred and Seventy 8%00 ($1,770.80) Dollars a month provided for in the agreement with Pasco Aviation, Inc.
“5. — In accordance with our agreement, in the event we pay off the outstanding balance on the aircraft in three (3) years or less, the interest will be computed from date at four (4%) per cent add on.
“Please acknowledge your acceptance in the space provided below.”

. Holbert’s letter to Interocean, dated October 4, 1965, was as follows:
“Attached is a letter to your attention from the Pinellas Central Bank authorizing you to release the aircraft, its equipment and records to my custody.
“As per our discussions, I would greatly appreciate it if you would see that:
“1. All available records are boxed and shipped airfreight collect to:
“Pinellas Central Bank & Trust Co.
“% Airmotive Suppliers
“International Airport, Miami, Florida
“2. Your bill for run-up and care of the aircraft should be made out to the bank and mailed to :
“International Aerodyne, Inc.
“PO Box 233
“International Airport, Miami, Fla.
“It would be helpful if you would see that a copy of the shipping bill of lading on the records is sent to the Aerodyne office for tracing.
“Your cooperation has been most helpful. It would be appreciated if you would continue care of the aircraft until other arrangements are made.”

. Missing from the pilot control panels were two clocks and one other unspecified instrument. In addition, a survey of the aircraft obtained by Aerodyne disclosed that of the two dozen inventoried items making up the aircraft’s electrical and communications equipment, three were missing. There was no showing that such customary items of equipment of a DC-7 aircraft were not available for purchase and installation. The absence of a portion of the passenger seats, which had been removed from the aircraft by Inter-ocean, was not a material circumstance at the time, since Interocean had and retained control of them through December of 1965, and as testified by its managing director, could have and would have returned them to the DC-7, if request had been made therefor.